USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9-27-16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOHNNIE BROWN,                                   :
                                                 :
                              Plaintiff,          :          **OPINION AND**
                                                 :          **ORDER**
                  - against -                     :
                                                 :          **15-CV-4823 (RLE)**
CAROLYN W. COLVIN,                                :
**Acting Commissioner of Social Security,**      :
                                                 :
                              Defendant.          :

**RONALD L. ELLIS, United States Magistrate Judge:**

## I.     INTRODUCTION

Plaintiff Johnnie Brown ("Brown") commenced this action under the Social Security Act
(the "Act"), 42 U.S.C. § 405(g)), challenging a final decision of the Commissioner of Social
Security (the "Commissioner") denying his claim for Social Security Disability ("SSD") and
Supplemental Security Income ("SSI"). On July 7, 2016, the Parties consented to the jurisdiction
of the undersigned for all proceedings pursuant 28 U.S.C. § 636(c).

On January 8, 2016, Brown moved for judgment on the pleadings pursuant to Federal
Rule of Civil Procedure 12(c), asking the Court to reverse the March 7, 2014 decision of the
Commissioner and to award and calculate benefits, or, in the alternative, to remand for a new
hearing. Brown argues that he is *per se* disabled under Medical Listing 12.05C, that the
administrative law judge ("ALJ") failed to weigh the medical opinion evidence properly, and that
the ALJ failed to evaluate Brown's credibility. On February 23, 2016, the Commissioner cross-
moved for judgment on the pleadings pursuant to Rule 12(c) for an order affirming the
Commissioner's decision.

For the reasons that follow, Brown's motion is **GRANTED** and the case is

**REMANDED** to the Commissioner for reconsideration and further development of the record.

## II.     BACKGROUND

**A.     Procedural History**

On January 21 and January 30, 2009, Brown applied for SSD and SSI, respectively,

because of a hernia, a pulled muscle, blurry vision, numbness in his left arm, and back pain.

(Transcript of Administrative Proceedings ("Tr.") at 197-98, 457.)  On March 19, 2009, the

Social Security Administration ("SSA") denied Brown's application.  (*Id.* at 219).  On May 20,

2009, Brown requested a hearing before an ALJ, which was held before ALJ Seth Grossman on

June 18, 2010.  (*Id.* at 227-29, 239).  ALJ Grossman issued a decision on November 30, 2010,

finding that Brown was not disabled within the meaning of the Act.  (*Id.* at 219-26).  Brown

requested review of the ALJ's decision by the Appeals Council.  (*Id.* at 304-05).  On May 7,

2010, the Appeals Council remanded the claim, finding that the ALJ had not fully addressed

Brown's alleged impairments of "mental retardation" or his psychological diagnoses, and

requiring that the ALJ consider new and material evidence submitted for review.  (*Id.* 214-18).

After hearings on June 18, 2010, October 8, 2010, July 30, 2012, March 18, 2013, and October

25, 2013, ALJ Grossman issued a decision on March 7, 2014, finding that Brown was not

disabled.  (*Id.* at 142, 187, 124-41, 44-74, 75-123, 20-43).  Brown requested review of the ALJ's

decision.  (*Id.* at 17-19).  On April 22, 2015, the Appeals Council denied review, making the

ALJ's decision the Commissioner's final decision.  (*Id.* at 1-6.)

**B.**   **The ALJ Hearings and Decision**

**1.**   **Brown's Administrative Hearing Testimony**

Brown was born in 1955. (Tr. at 179.) He is single, and has two sons and a daughter. (*Id.* at 52, 84.) He lives with his daughter and her child. (*Id.* at 84.) He attended school until the seventh grade, taking special education classes. (*Id.* at 50-51.) Brown previously worked as a prep cook, a short order cook, a dishwasher, an usher, and a waiter. (*Id.* at 54, 134-37.) At the October 2010 hearing, Brown testified that he left his last job at a restaurant in 2008 "because the doctor told [him he] had to stop working" and because "the restaurant locked down." (*Id.* at 150, 153.)

Brown testified in hearings held in 2010, 2012, and 2013, that he cannot work because of his back pain, heart problems, shoulder problems, and a hernia. (Tr. at 152, 131, 81.) His testimony often reflected communication difficulties. He stated that he can no longer stand up or lift items anymore "because [he] got poison in the side of [his] stomach" from his hernia. (*Id.* at 153.) Although he had surgery for the hernia in 2011, he still has pain when he "lift[s] something too heavy." (*Id.* at 133.) Brown also testified that he cannot walk more than a block. (*Id.* at 172.) He described difficulties filling out job applications and reading newspaper and magazine articles. (*Id.* at 56-57.) He said that he had someone read the hearing notice to him. (*Id.* at 129.) Brown had difficulty doing mental math questions the ALJ asked him. For example, he could not determine how much change he would give if he were given a dollar for a seventy-three cent item, but could calculate the change for a fifty cent item. (*Id.* at 129-30). When the ALJ asked Brown, "you're not mentally retarded, are you?" Brown replied that he was "not retarded," and added that he cannot read. (*Id.* at 163.) When asked what was "physically" wrong with him, Brown replied, "I'm slow, real slow." (*Id.* at 129.)

3

At the October 2013 hearing, Brown testified that he watches his granddaughter and takes her to the park. (*Id.* at 82.) He noted that he does not carry her, but pushes her stroller. (*Id.* at 83.) He does not cook for his granddaughter but microwaves food that his daughter has left. (*Id.* at 82.) His daughter also handles the laundry and money. (*Id.* at 172.) Although he told a social worker that he does laundry and cleans the house, he testified at the October 2010 hearing that he stopped doing those activities because his knees began to give out. (*Id.* at 173.) He testified that he can walk for more than an hour a day but cannot sit for "too long." (*Id.* at 106.) The ALJ noted that Brown was using a cane during the July 2012 hearing, which Brown explained was because his back "is out of order...dislocated." (*Id.* at 131.) At the October 2013 hearing, Brown testified that his "back was starting to get to [him]" during the hearing. (*Id.* at 106.)

### 2. Relevant Medical Evidence

#### a. Treating Physician Marguerite Bernard, M.D.

Brown had received treatment by Dr. Marguerite Bernard, his primary care physician at Morris Height Health Center, since April 2009. (Tr. at 746.) Most of Brown's visits with Dr. Bernard addressed his lower back pain, hernia, and depression. (*Id.* at 635.) On April 28, 2009, Dr. Bernard diagnosed a left inguinal hernia.[1] (*Id.*) On December 30, 2009, he diagnosed Brown with mild depression and referred him to a behavioral health specialist after Brown stated he was "wrapped too tight." (*Id.* at 724.) On a July 16, 2010 visit, Brown complained of pain when he tried to stand. (*Id.* at 716.) Dr. Bernard's physical examination revealed no acute distress, and she prescribed Tramadol for pain. (*Id.* at 717). She referred Brown to a psychiatric specialist and to a urologist for his hernia. (*Id.*)

---

[1] An "inguinal hernia" is a hernia (the abnormal protrusion of part of an organ or tissue) which occurs in the groin or where the abdominal folds of flesh meet the thighs. *See Inguinal Hernia,* Farlex Partner Medical Dictionary (2012) http://medical-dictionary.thefreedictionary.com/inguinal+hernia (last visited July 13, 2016).

4

On July 16, 2010, Dr. Bernard ordered x-rays of Brown's spine and hips, which showed mild anterior spondylosis[2] and degeneration of the spine at L4-L5[3]. (Tr. at 720-22.) She opined that although the x-rays were "indicative of possible early osteoarthritis," they were otherwise "unremarkable." (Tr. at 636.) On a July 29, 2010 Multiple Impairment Questionnaire, Dr. Bernard described Brown's lower back pain as "sharp, when he tries to stand." (*Id.* at 636.) Brown reported that the lower back pain started after a motor vehicle accident in 1972. (*Id.*) Dr. Bernard estimated his level of pain at eight out of ten, or "moderately severe." (*Id.* at 637.) She opined that Brown could lift or carry up to five pounds occasionally, and stated that Brown should avoid pushing or pulling objects greater than five pounds because of his inguinal hernia. (*Id.* at 638.) She stated that Brown's symptoms were severe enough to interfere with his attention and concentration frequently, and she determined that he had "mild depression." (*Id.* at 640.) Dr. Bernard thought Brown was capable of low stress work, would need around four breaks in an eight-hour workday, and would have to rest fifteen to thirty minutes before returning to work. (*Id.* at 640.) She determined that Brown's impairments were likely to produce "good days" and "bad days," and that he would likely be absent more than three times a month from work. (*Id.* at 641.)

Brown had hernia surgery on December 14, 2010. (Tr. at 857-80.) On March 11, 2011, he returned to Dr. Bernard for low back pain. (*Id.* at 810.) Dr. Bernard advised him to avoid lifting, pushing, or pulling heavy objects and prescribed Tramadol. (*Id.* at 811.)

---

[2] "Spondylosis" is defined as a disease of a vertebra, such as osteoarthritis. 1 Attorneys Medical Deskbook § 12:5.
[3] "L4 to L5" refer to the two lowest vertebrae in the lumbar spine. *See All About the l4-l5 Spinal Segment,* Spine Health, http://www.spine-health.com/conditions/spine-anatomy/all-about-l4-l5-spinal-segment (last visited on July 25, 2016).

### b.     Treating Physician Chaula Patel, M.D.

Brown visited Dr. Chaula Patel multiple times throughout 2011, 2012, and 2013,

complaining of low back pain. (Tr. at 856, 815, 863, 899, 885, 902, 915, 921.)  During his first

visit, in March 28, 2011, Brown indicated that he had had chronic back pain for more than ten

years, which included a "pins and needles" sensation going down his right leg, pain after walking

three to four blocks, and an inability to stand for more than four to five minutes at a time before

feeling tired. (Tr. at 856.)

In a Multiple Impairment Questionnaire administered on July 28, 2011, Dr. Patel

diagnosed Brown with chronic low back pain, and opined that in an eight-hour workday, Brown

could sit for eight hours, stand or walk for two to three hours, lift or carry five pounds frequently

and ten pounds occasionally. (Tr. at 817, 819-20.)  She opined that Brown would likely have

"good days" and "bad days," and would need to take unscheduled breaks to rest every two hours

during an eight-hour workday for five to ten minutes at a time. (Tr. at 822-23.)  She speculated

that Brown would likely be absent from work two to three times a month. (Tr. at 823.)  She

reported no limitations in performing repetitive reaching, turning and lifting, and did not think

Brown's pain would interfere with his attention and concentration. (Tr. at 821-22.)

In a second Multiple Impairment Questionnaire administered on October 19, 2012, Dr.

Patel's opinion suggested worsening symptoms. (Tr. at 887-88.)  She reported that in an eight-

hour workday, Brown could only sit for one hour or less, stand or walk for one hour or less, and

could lift or carry five pounds only occasionally.  (*Id.*)  She rated Brown's pain and fatigue as

moderately severe, or eight and seven out of ten. (Tr. at 887.)  Dr. Patel now thought Brown

would likely be absent from work more than three times a month. (Tr. at 892.)  She reported

significant limitations in performing repetitive reaching, turning, and lifting. (Tr. at 888-89.)

6

She opined that Brown's symptoms were constantly severe enough to interfere with his attention and concentration.  (Tr. at 890.)

Dr. Patel's examinations of Brown from 2011 to 2013 revealed a mobile mass in Brown's abdominal wall, pain to palpation over the sacroiliac area, an inability to perform a range of motion and an inability to squat, and a positive bilateral straight leg raise,[4] repeatedly through the visits.  (Tr. at 856-59, 901, 904, 910, 916, 920, 922.)  Throughout 2011 to 2013, Dr. Patel prescribed Naprosyn and Flexeril, sometimes discontinuing Naprosyn then continuing it again. (Tr. at 858, 900, 901, 909, 915.)  She sometimes prescribed Acetaminophen-Codeine or Ibuprofen as well.  (Tr. at 900, 915.)  In July and August 2012, Dr. Patel prescribed a cane for Brown.  (Tr. at 867-68, 909.)

In July 2012, Dr. Patel ordered an MRI of the lumbar spine.  (*Id.* at 868.)  The MRI revealed disc bulges at L3-L4 and L4-L5 with thecal sac impingement at both levels and mild levocurvature.[5]  (*Id.* at 883-84.)

### c.      Consulting Psychologist Arlene Broska, Ph.D.

Dr. Arlene Broska, a psychologist, examined Brown at the request of the ALJ on September 2, 2010.  (Tr. at 662-65).  Brown reported having difficulty falling asleep, a poor appetite, and an inability to work because of "a bad back."  (*Id.* at 662.)  He did not report symptoms of depression, anxiety, panic or mania.  (*Id.* at 662.)  Brown noted being able to dress, bathe and groom himself, cook and prepare food once a week, clean once a week, do laundry twice a week, and take public transportation.  (*Id.* at 664.)  A friend who lived next door to

---

[4] Straight-leg-raising test to seventy-five degrees indicates compression of the nerves in the lower back. *Straight leg-raising test*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, THIRTY-SECOND ED. (2012).

[5] "Levocurvature," also known as Levoscoliosis, is a "spinal curve to the left." *See Scoliosis Types*, Spine Health, http://www.spine-health.com/conditions/scoliosis/scoliosis-types (last visited on September 21, 2016).

Brown helps Brown read mail and Brown's daughter does the shopping. (*Id.*) Brown spends his days going to the park, watching television, and listening to the radio. (*Id.*)

After a mental status examination, Dr. Broska reported that Brown has "mildly impaired" memory skills, a "level of intellectual functioning in the deficient range," a "limited" fund of information, "fair to poor" judgment, and "poor math skills." (Tr. at 663-64.) Brown's manner of relating, social skills, and overall presentation were deemed "adequate." (*Id.* at 663.) His thinking was "coherent and goal directed," without evidence of hallucinations during the evaluation. (*Id.*) Dr. Broska opined that Brown could follow and understand simple directions and instructions, perform simple and complex tasks independently, maintain a regular schedule, maintain attention and concentration, relate adequately with others, and deal with "some stress." (*Id.* at 681-82.) She also opined that Brown may have difficulty learning new tasks and that his cognitive problems "may interfere with [his] ability to function on a daily basis, without support." (*Id.* at 681-84.) She assessed that Brown would have moderate issues with carrying out complex instructions and making judgments on complex work-related decisions. (*Id.* at 666.) She administered a Wechlser Adult Intelligence Scale, 4th edition (WAIS-IV)[6] examination, on which Brown was assessed a full scale IQ score of 66, a verbal comprehension and perceptual reasoning score of 63, and a processing speed score of 71. (*Id.* at 680-81.) Dr. Broska's

---

[6] The Wechsler Intelligence Scale tests are "the most widely-accepted IQ tests in the United States." *United States v. Wilson,* 922 F. Supp. 2d 334, 344 (E.D.N.Y. 2013), *on reconsideration,* No. 04-CR-1016 (NGG), 2016 WL 1060245 (E.D.N.Y. Mar. 15, 2016). The test includes many subsets, which may evaluate a person's verbal abilities and performance abilities. *Id.* The sum of points earned on the subsets is the raw score for a person's IQ, which is then converted to an overall score called the "full scale IQ." *Id.* The American Association on Intellectual and Developmental Disabilities (AAIDD) and the American Psychological Association (APA) define significantly sub-average intellectual functioning by reference to an IQ score approximately two standard deviations below the mean, or 70. *Id.*

prognosis was "guarded," and she diagnosed a reading disorder as well as a mild mentally impaired range of intellectual functioning. (*Id.* at 682.)

### d.     Psychological Expert Edward Halperin, M.D.

Non-examining consulting physician Dr. Edward Halperin testified at the March 2013 hearing after reviewing Brown's medical records. (Tr. at 57.) Dr. Halperin initially indicated that he did not think Brown met any listing from "any psychiatric point of view," but later clarified that the IQ score of 66 did meet the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 58, 65.) Dr. Halperin noted, however, that while the record indicated that Brown has cognitive problems that may interfere with his ability to function on a daily basis without support, Brown was "able to" work. (*Id.* at 61.) During the hearing, he agreed with the ALJ's statement, "the proof of it lies in the pudding and if … a person is able to do … something, that's the best proof in the world he can do something." (*Id.*) Dr. Halperin also cited Dr. Patel's report at 41F stating that Brown could tolerate work with physical limitations, although the ALJ responded that he would not ask Dr. Halperin about physical limitations. (*Id.*) Despite the ALJ's response, Dr. Halperin pointed out that Brown's prescribed medications were only for physical impairments, without stating explicitly what conclusions he drew from this. (*Id.* at 62.)

### e.     Orthopedic Surgeon Malcolm Brahms, M.D.

Dr. Malcolm Brahms, an orthopedic surgeon, also reviewed Brown's medical records and testified at the March 2013 hearing. (Tr. at 85). Dr. Brahms did not believe the evidence showed that Brown met the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 86.) He focused on two consultative examinations of Brown—by consulting physician Dr. Edynak on April 28, 2010, and by consulting physician Dr. Tranese on September 2, 2010—

which he described as "relatively all unremarkable." (*Id.*) He opined that Brown's physical changes would be expected in anyone his age, particularly an x-ray showing an "S1 transitional body[7] and spondylosis at L4 to L5." (*Id.* at 87, 100). He acknowledged, however, that these degenerative changes, even if common in Brown's age group, can cause pain. (*Id.* at 88.) Dr. Brahms testified that an MRI of Brown showing disc bulges at L3 to L4 and L4 to L5 was not expected of someone Brown's age, but that these findings were "not indicative of any major concern." (*Id.* at 101-02.)

When asked about Dr. Patel's records, which indicated Brown's inability to perform a range of motion because of pain, an inability to squat, and positive straight leg raises, Dr. Brahms testified that these records did not "tell [him] anything." (*Id.* at 99-100.) He later testified, however, that positive straight leg raising indicates a complaint of low back pain, or a restriction in the hamstring or low back region, and is a sign of pressure on the lumbar area when Brown raises his legs. (Tr. at 103-04.) Dr. Brahms opined that all of Brown's examinations prior to his visit with Dr. Patel, where she found a positive straight leg raise, were "completely within normal limits." (*Id.* at 104.) He believed Brown was capable of performing light activity. (*Id.* at 105.)

### f.    Consulting Examiner William Lathan, M.D.

Dr. William Lathan examined Brown on March 6, 2009, at the request of the Social Security Administration. (Tr. at 545.) He reported that Brown had been complaining of a hernia since 2004, and had no complaints related to his shoulders or arms. (*Id.* at 543.) He observed that Brown was able to rise from the chair without difficulty and appeared to be in "no acute

---

[7] An "S1 transitional body" refers to an improperly formed vertebra on the spine. This is a condition that is present from birth. The term "transitional" here refers to the way the vertebra takes on characteristics of both the lumbar an sacral vertebrae of the spine. *See Transitional Lumbo Sacral Vertebrae,* http://www.medfriendly.com/transitional-lumbo-sacral-vertebrae.html (last visited July 28, 2016).

distress." (*Id.* at 546.) He opined that Brown's spine x-rays were "unremarkable," but noted there was a "transitional L5 vertebral body." (*Id.*) He diagnosed a left inguinal hernia. (*Id.* at 547.) He stated that Brown has a "severe restriction for lifting, pushing, pulling, prolonged standing, prolonged walking and strenuous exertion." (*Id.*)

### g.   Consulting Examiner Eugene Edynak, M.D.

Dr. Eugene Edynak examined Brown on April 28, 2009, at the request of the Social Security Administration. (Tr. at 556.) He reported that Brown had been complaining of back pain at a pain level of five out of ten since 2009, as well as shoulder pain. (*Id.* at 554.) Brown's back pain was "somewhat relieved by medications," and he could sit for ten minutes, stand for three minutes, and walk two city blocks and go up four steps. (*Id.*) Brown did not appear to be in any acute distress during the examination, and was able to rise from the chair without difficulty. (*Id.* at 555.) Brown reported cooking, cleaning, doing laundry, shopping two times a week, watching television, and socializing with friends. (*Id.*) Dr. Edynak diagnosed chronic low back pain with minimal restricted range of motion, a history of hypertension and chronic shoulder pain, and minimal restricted range of motion of the left shoulder. (*Id.* at 556.) His prognosis was "good" and he found Brown would have minimal limitations with sitting, standing, walking, climbing stairs, and heavy lifting because of his chronic low back pain. (*Id.*) Dr. Edynak opined that Brown could occasionally lift up to ten pounds, could sit for ten minutes at a time, could stand for fifteen minutes at a time and walk for ten minutes at a time. (*Id.*) In an eight-hour workday, Dr. Edynak estimated that Brown could sit for three hours, stand for two hours, and walk for two hours. (*Id.* at 559).

### h.    Consultative Examiner Louis Tranese, D.O.

Dr. Louis Tranese examined Brown at the SSA's request on September 2, 2010.  (*Id.* at
671.)  Brown complained of knee pain for the previous four years and chronic low back pain for
the previous eight years, rated at a pain level of five to six out of ten.  (*Id.* at 669.)  Brown
reported doing his own cooking, cleaning, and laundry.  (*Id.* at 670.)  He appeared to be in no
acute distress during the examination and was able to rise from the examination table and chair
without difficulty.  (*Id.*)  Dr. Tranese diagnosed bilateral knee pain and chronic low back pain and
a self-reported history of hypertension.  (*Id.* at 671.)  His prognosis was "good."  (*Id.*)  Dr.
Tranese opined that Brown may have moderate limitations with activities that require heavy
lifting, frequent bending, squatting or kneeling.  (*Id.*)  Brown had mild to moderate limitations
with frequent stair climbing, and long-distance ambulation.  (*Id.*)  Dr. Tranese opined that Brown
might have mild limitations with sitting or standing long periods.  (*Id.*)  He also opined, however,
that Brown could sit for six hours and stand or walk for two hours at one time without
interruption, and in an eight-hour workday, could sit, stand, and walk for eight hours.  (*Id.* at
674.)

### i.    F.E.G.S. Examiner Padmavathi Jagarlamudi, M.D.

Dr. Padmavathi Jagarlamudi examined Brown on May 21, 2009, and July 1, 2010.  At the
2009 visit, Brown reported hearing voices, seeing "someone or something [pass] him," feeling
depressed for more than half of the day, having little interest or pleasure in doing things, and
trouble falling or staying asleep for several days at a time. (Tr. at 696-97, 704.)  He reported
chronic pain traveling from his neck down to his left shoulder and hand, and lower back pain.
(*Id.* at 669.)  He stated that he had difficulties in traveling alone because of his fear of falling
from dizziness.  (*Id.*)  He traveled to the appointment by subway, and Dr. Jagarlamudi noted that

he was unable to travel during rush hours. (*Id.* at 697.) Brown reported watching television, sitting in the park, and being able to wash dishes, do laundry, mop the floor, shop for groceries, and groom himself. (*Id.* at 698.) Dr. Jagarlamudi found Brown had an abnormal gait and station, an abnormal spine, abnormal head and neck conditions, low back pain, upper and lower extremities with joint swelling, as well as a decreased fund of knowledge, an abnormal mood and affect, and impaired recent and remote memory. (*Id.* at 704-05.) She administered a Patient Health Questionnaire, which showed Brown had "moderately severe" depression. (*Id.* at 697.) Dr. Jagarlamudi diagnosed Brown with depression, low back pain, shoulder pain, a left inguinal hernia, a hearing problem, and an issue with "drugs and alcohol."[8] (*Id.* at 708.)

During the 2010 visit, Brown traveled to the appointment by taxi and Dr. Jagarlarmudi again noted that he was unable to travel during rush hours. (Tr. at 607.) Brown complained of mood swings, weakness, hearing voices, anxiety and fearfulness, loss of appetite, suicidal thoughts, fear of going outside and forgetting things, and an inability to sit still. (*Id.* at 567-68.) He denied auditory and visual hallucinations. (*Id.* at 607.) Dr. Jaglarmudi reported a depression severity of "mild." (*Id.* at 606.) Brown reported he could go outside to walk, cook, clean, read and watch television, and socialize. (*Id.* at 607.) Dr. Jagarlamudi diagnosed schizophrenia, cannabis abuse, and alcohol abuse. (*Id.* at 570.) She opined that Brown was disabled, and had a severe functional impairment in his ability to follow work rules, deal with the public, maintain attention, relate to co-workers, adapt to change and adapt to stressful situations. (*Id.* at 570-71.)

### 3.   The Decision of ALJ Seth Grossman

On March 7, 2014, ALJ Grossman issued his decision, finding that Brown was not disabled within the meaning of the Act. (Tr. at 25.) The ALJ applied the five-step sequential

---

[8] Dr. Jagarlamudi listed "drugs and alcohol" on her final diagnosis, while in the questionnaire she reported no history of misuse of alcohol or other substance, and no current misuse of substances. (Tr. at 708, 695.)

analysis, 20 C.F.R. § 416.920(a)(4), finding at step one that Brown had not engaged in substantial gainful activity after August 10, 2007. (*Id.*)

At step two, the ALJ considered the medical severity of Brown's impairment, and found that Brown's disc bulges at L3-L5 and history of a left inguinal hernia were severe impairments. (*Id.* at 26.) The ALJ found Brown's mental impairments were "nonsevere" because they caused no more than minimal limitation in Brown's ability to perform basic mental work activities. (*Id.* at 27.) The ALJ noted that though there were mentions of schizophrenia and depression, Brown had not received mental health treatment and "various doctor's notes contain no psychiatric complaints." (*Id.*)

At step three, the ALJ concluded that Brown's impairments were not of a severity that met or medically equaled the criteria of an impairment in Appendix 1 of the regulations. (*Id.* at 27. citing 20 C.F.R. Part 404, Subpart P, Appendix 1). The ALJ concluded that Brown did not meet either paragraph B criteria of listing 12.05 or paragraph C criteria of 12.05. (*Id.* at 29.)

At step four, the ALJ found that Brown had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (Tr. at 30.) The ALJ found that Brown's testimony concerning the intensity, persistence and limiting effects of his symptoms was not credible. (*Id.* at 33.) In making his determinations, the ALJ gave significant weight to the opinion of non-examining medical expert Dr. Brahms, some weight to the opinion of treating physician Dr. Bates, and little weight to opinions of Dr. Bernard and Dr. Patel, who reported limitations consistent with sedentary or less than sedentary work. (*Id.*)

At Step Five, where the ALJ had the burden of demonstrating whether Brown was still capable of performing gainful activity that exists in the national economy, ALJ Grossman found

that Brown was capable of performing past relevant work as a waiter. (Tr. at 34.)  The ALJ thus

concluded that Brown was not disabled under the Act.

## C.    Appeals Council Review

After the ALJ's March 7, 2014 decision, Brown requested review by the Appeals Council

on March 25, 2014.  *(Id.* at 17.)  On April 22, 2015, the Appeals Council denied Brown's request

for review and the ALJ's decision became the final decision of the Commissioner.  *(Id.* at 1.)

## III.    DISCUSSION

### A.    Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §§ 405(g),

1383(c)(3).  Therefore, a reviewing court does not determine *de novo* whether a claimant is

disabled.  *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam)

(citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S.

319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)).  Rather, the court is limited to "two levels of

inquiry."  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  First, the court must determine

whether the Commissioner applied the correct legal principles in reaching a decision.  42 U.S.C.

§ 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986);

*accord Brault*, 683 F.3d at 447.  Second, the court must decide whether the Commissioner's

decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g).  If the

Commissioner's decision meets both of these requirements, the reviewing court must affirm; if

not, the court may modify or reverse the Commissioner's decision, with or without remand.  *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided

that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d

183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's

decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

**B.    Determination of Disability**

**1.    Evaluation of Disability Claims**

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [he] can still do despite [his] limitations."  20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-

18

9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

## 2.     The Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative or non-examining physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("SSA regulations provide a very specific process for evaluating a treating physician's opinion and instruct ALJs to give such opinions 'controlling weight' in all but a limited range of circumstances.").

If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler,* 3 F.3d at 567-69. The Commissioner may rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed. 20 C.F.R. § 416.927(e).

The ALJ is required to explain the weight ultimately given to the opinion of a treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 129); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199-200 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

Furthermore, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record," especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) ("[A] proper application of the treating physician rule mandates that the ALJ assure that the claimant's medical record is comprehensive and complete."). Similarly, "if an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative

21

record accordingly." *Hartnet v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998), *accord Rosa*, 168 F.3d at 79.

Finally, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

### 3. The Commissioner's Duty to Develop the Record

The ALJ generally has an affirmative obligation to develop the administrative record. 20 C.F.R. § 404.1512(d); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). Under the Act, the ALJ must "make every reasonable effort to obtain from the individual's treating physician ... all medical evidence, including diagnostic tests, necessary in order to properly make" a determination of disability. 42 U.S.C. § 423(d)(5)(B). Furthermore, when the claimant is unrepresented by counsel, the ALJ "has a duty to probe scrupulously and conscientiously into and explore all relevant facts . . . and to ensure that the record is adequate to support his decision." *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999), citing *Dechirico v. Callahan*, 134 F.3d 1177, 1183 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996). Remand to the Commissioner is appropriate when there are "obvious gaps" in the record and the ALJ has failed to seek out additional information

to fill those gaps. *See Lopez v. Comm'r of Soc. Sec.*, 622 Fed. Appx. 59 (2d Cir. N.Y. 2015), citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

## C.    Issues on Appeal

In his Motion for Judgment on the Pleadings, Brown argues that (1) the ALJ wrongfully found that Brown did not meet or equal Medical Listing 12.05C; (2) the ALJ failed to weigh the medical opinion evidence properly; and (3) the ALJ failed to evaluate Brown's credibility properly.  (Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem.") at 14, 15, 22.)  In her Cross-Motion for Judgment on the Pleadings, the Commissioner argues the ALJ's decision is supported by substantial evidence, and the ALJ was entitled to discount the statements of Brown's treating physicians.  (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings ("Def. Mem.") at 11, 23.)

### 1.    At Step Three of the Sequential Analysis, the ALJ Improperly Determined that Brown's Impairments Did Not Meet or Medically Equal a Listed Impairment.

At step three of the sequential analysis, the ALJ concluded that Brown's impairments were not severe enough to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the regulations.  (Tr. at 29-30.)  In making this finding, the ALJ considered Listing 12.05C (Intellectual Disability), which states that an individual is considered *per se* intellectually disabled when (1) the evidence demonstrates or supports onset of the impairment before age 22; and (2) when there is a valid verbal, performance, or full scale IQ of 60 through 70; and (3) when there is additional physical or mental impairment that imposes an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpart P, App. 1 § 12.05.

The ALJ concluded that Brown did not meet the first prong of Listing 12.05C because the evidence did not show the onset of impairment before Brown turned 22; "[Brown] was age 52 as of his alleged onset," and had "worked for many years at the level of substantial gainful activity." (*Id.* at 30.) Brown argues that the ALJ cannot use evidence of his past work history to decide whether he meets Listing 12.05C. (Pl. Mem. at 14, citing *Barton v. Astrue*, No. 3:08-CV-0810 FJS/VEB, 2009 WL 5067526, at *8 (N.D.N.Y. Dec. 16, 2009) (reversing ALJ decision that claimant could not meet Listing 12.05C because of past work activity).) Brown maintains that the record shows no evidence of trauma or other organic causes which might suggest a later onset of decreased intellectual functioning, or which might rebut a presumption that Brown's IQ has remained constant throughout his life. (Pl. Mem. at 14, citing *Talavera v. Astrue*, 697 F.3d 145, 152 (2d Cir. 2012) (current IQ testing will be presumed to document the claimant's level of functioning prior to age 22 absent trauma or other cause for a later decrease).) Brown argues that the onset of his intellectual disability prior to age 22 can be inferred by circumstantial evidence, such as Brown leaving school around the seventh grade, taking special education classes, and having severe problems with reading, writing, and math. *Id.* The ALJ failed to mention this evidence, which might support a finding that Brown could have had an earlier onset of deficits in his adaptive functioning. Because the ALJ did not reconcile this evidence, the Court cannot evaluate whether the decision was supported by substantial evidence.

In analyzing the second prong of Listing 12.05C, the ALJ relied on Dr. Halperin's testimony noting that Brown's IQ scores were lower because of Brown's limitations in reading. (*Id.* at 30.) During the hearing, Dr. Halperin testified that because Brown "worked impulsively and rapidly," his score might have been lowered. (*Id.* at 69.) Though the ALJ found the IQ score misrepresentative, he relied on the testimony of a non-examining doctor to discredit the

score, instead of attempting to clarify his confusion with the doctor who gave Brown the IQ

assessment. The ALJ also did not request a more appropriate form of Intelligence testing to

account for the possible inaccuracies suggested by Dr. Halperin. Listing 12.00 states: "in special

circumstances, such as the assessment of individuals with ... communication abnormalities ...

measures such as Test of Nonverbal Intelligence, Third Edition (TONI-3), Leitner International

Performance Scale-Revised (Leiter-R) or Peabody Picture Vocabulary Test-Third Edition

(PPVT-III) may be used." 20 C.F.R. Part 404, Subpart P, App. 1. By failing to request

additional testing before concluding that Brown did not have an intellectual disability, the ALJ

failed to follow his affirmative duty to develop the administrative record. 20 C.F.R. §

404.1512(d).

Finally, the ALJ failed to address Brown's physical conditions under the third prong of

Listing 12.05C, even though he had previously found that Brown's physical impairments were

severe at step two of the sequential analysis. Without an explanation of the crucial factors in the

ALJ's determination of whether Brown met or medically equaled the criteria of the Listing, the

Court cannot discern whether the ALJ's determination is supported by substantial evidence.

The Court finds that the ALJ failed to seek out additional information to fill gaps in the

administrative record and did not discuss the factors behind his decision with sufficient

specificity. The Court thus orders that this case be remanded for reconsideration.

**2.     The ALJ Violated the Treating Physician Rule.**

**a.     The ALJ Did Not Provide "Good Reasons" for the Weight He
        Assigned to Treating Physicians.**

The ALJ gave "little weight" to Brown's treating physician, Dr. Bernard, who opined in a

July 29, 2010 report that Brown was unable to stand or walk continuously in a work setting, and

that he could only lift and carry up to five pounds occasionally. (*Id.* at 637.) ALJ Grossman

assigned little weight to the report because it was written only two weeks after Brown was initially seen for back pain, and Dr. Bernard's opinions were "not consistent with clinical findings in the record, the level of treatment received, or [Brown's] admitted daily activities, noting that Dr. Bernard found Brown's x-rays to be "unremarkable." (*Id.* at 33.)

The ALJ did not cite to the specific exhibits, outside of Brown's x-rays, with which he found Dr. Bernard's opinions inconsistent. Nor did he explain why exhibits seemingly consistent with Dr. Bernard's findings, such as examinations revealing a large left inguinal hernia, pain on palpation over the sacroiliac area, inability to perform a range of motion because of pain, inability to squat, and positive bilateral straight leg raise, were not adequate clinical findings in the record. (Tr. at 717, 885.) The ALJ did not explain the inconsistency in the level of treatment received by Brown. By providing rote and conclusory reasoning, the ALJ failed to demonstrate how Dr. Bernard's opinion is inconsistent with the evidence. *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

The ALJ also gave "little weight" to treating physician Dr. Patel, because her opinions "were not consistent with the clinical findings in the record, the level of treatment received, or [Brown's] admitted daily activities." (*Id.* at 33.) Such conclusory reasons similarly fail the "good reasons" requirement of the Treating Physician Rule and are grounds for remand. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199-200 (2d Cir. 2012), *Greek*, 802 F.3d at 375.

### b. The ALJ Failed to Consider the Factors Listed in the SSA When Weighing the Consultative Doctors' Opinions.

The ALJ gave significant weight to the opinion of Dr. Brahms, who opined that Brown is able to perform light work. (Tr. at 33.) Brown argues that Dr. Brahm's testimony was entitled to less probative weight, as he was a non-examining medical consultant. (Pl. Mem. at 17.) While

26

the Commissioner may rely on opinions of other physicians, he must consider (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion (3) the consistency of the opinion with the record as a whole (4) the specialization of the physician and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); Schisler, 3 F.3d at 567-69.

Dr. Brahms' testimony at the hearing was inconsistent with itself as well as the medical record. Dr. Brahms initially stated that Dr. Patel's multiple examination revealing positive straight leg raises did not tell him "anything," and later stated that a positive straight leg indicates low back pain, a restriction in the hamstrings or low back region, or pressure on the lumbar area when legs are raised. (Tr. at 99, 103-04). While Dr. Brahms believed Brown was capable of performing light activity, he also did not challenge the opinion of Dr. Lathan that Brown had a "severe restriction for lifting, pushing, pulling, prolonged standing, prolonged walking, and strenuous exertion." (*Id.* at 93.) Dr. Brahms insisted that Brown's test results were expected of someone his age, but when asked about an MRI showing disc bulges at L3 to L4 and L4 to L5, with impingement on the fecal sac, Dr. Brahms admitted that such a result was not normal for Brown's age group. (*Id.* at 102.) The ALJ improperly gave Dr. Brahms' opinion significant weight, although Dr. Brahms' testimony at the hearing contradicted evidence in the record and did not provide clarifications for his own inconsistencies. The ALJ also failed to consider the length, nature and frequency of the physician's relationship when weighing Dr. Brahms' opinion, given that Dr. Brahms did not examine Brown.

The ALJ did not assign weight to opinions from consulting physicians Dr. Jagarlamudi or Dr. Broska, who opined that Brown's functional limitations would get in the way of his ability to work. (*Id.* at 580, 664.) An ALJ is required to "evaluate every medical opinion received." 20

C.F.R. § 404.157. The ALJ may not "cherry-pick" medical opinions that support his or her opinion while ignoring opinions that do not. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). The Court finds that the ALJ improperly weighed the medical opinions related to Brown's impairments and orders that the case be remanded for reconsideration.

### 3.    The ALJ Improperly Evaluated Brown's Testimony About the Intensity, Persistence, and Limiting Effects of His Symptoms.

The ALJ found that Brown's testimony concerning the intensity, persistence, and limiting effects of his symptoms was not credible. (Tr. at 33.) The ALJ noted that the record indicated Brown could travel independently by public transportation and take his granddaughter to the park, and while he sometimes listed pain at a significant level, he also listed levels of pain at two out of ten on a number of occasions. (*Id.*) The ALJ noted that Brown made statements indicating that "he was laid off when the company he was working for closed down." (*Id.*) The ALJ also referred to Brown's testimony that "if someone offered him $12 an hour to be a waiter, he would try to do it." (*Id.*)

Brown's ability to complete activities of daily living does not contradict his descriptions of, and doctor's opinions regarding, his back pain and difficulty walking and sitting for prolonged periods. The ALJ acknowledged that the record demonstrated "complaints of significant pain," but he did not explain why he dismissed those and found the occasions where Brown reported pain at a low level to be determinative. (Tr. at 33.) Dr. Bernard opined that Brown's impairments will likely cause "good days" and "bad days," and this is consistent with Brown's reports of pain at low levels on some days, and high levels on other days. (*Id.* at 641.) While Brown stated that he left his job because the restaurant shut down, he also mentioned that the doctor told him he had to stop working. (*Id.* at 150, 153). Brown also argues that simply

because he may have stopped working for conditions unrelated to his medical condition, it does not follow that he is not disabled. (*Id.* at 24.) The Court agrees.

The Second Circuit has found that "a claimant need not be [an] invalid to be found disabled." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citing *Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir.1988)). It has also held that when a disabled person "chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989).

Brown's nonmedical testimony that he would try to work a job if he was offered $12 an hour does not equate to him having the ability to do so. (*Id.* at 137.) Brown's testimony reveals imprecision and, oftentimes, confusion over the question being asked—he referred to his hernia surgery as "heart" surgery, forgot the year that he had stopped working, and when asked where he had previously worked, responded "I'm trying to—let me get it together. A label," later correcting "label" to "restaurant." (*Id.* at 95, 147-52.) When asked how much he reported on his tax return, Brown responded, "I don't know ... I'm saying that when I received the tax return?" (*Id.* at 158.) Rather than discrediting Brown's statements about his inability to work, and taking his statements suggesting ability as the final word, the ALJ should have taken this imprecision to suggest further lines of inquiry. The ALJ should have also recognized that his leading questions, including "you're not mentally retarded, are you?" could not provide reliable evidence of Brown's ability to work. (*Id.* at 163.)

The ALJ cannot selectively decide Brown is credible whenever he suggests ability, but not credible when he describes the severity of his impairments, as "reliance on cherry-picked evidence does not satisfy a substantial evidence standard." *Tim v. Colvin*, No. 6:12-CV-1761

GLS/ESH, 2014 WL 838080, at *8 (N.D.N.Y. Mar. 4, 2014) (citing *Fiorello v. Heckler,* 725

F.2d at 174, 175–76 (2d Cir. 1983)).  Mischaracterizing or ignoring evidence of Brown's alleged

disability also does not satisfy a substantial evidence standard.  *See Ericksson v. Comm'r of Soc.*

*Sec.,* 557 F.3d 79, 82-84 (2d Cir. 2009); *Kohler v. Astrue,* 546 F.3d 260, 269 (2d Cir. 2008).

When an ALJ's reasons for discrediting a claimant's testimony does not constitute substantial

evidence, remand is warranted.  4 Soc. Sec. Law & Prac. § 55:76.

## IV.    CONCLUSION

For the reasons set forth above, the Court **GRANTS** Brown's motion for judgment on the

pleadings, **DENIES** the Commissioner's cross-motion, and **REMANDS** this case to the

Commissioner for reconsideration in accordance with this Order and Opinion. On remand, the

ALJ must develop the record of medical evidence related to Brown's IQ, apply proper weight to

treating physicians' medical opinions, and re-assess Brown's testimony.

**SO ORDERED this 28th day of September 2016**
**New York, New York**

_____

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

GLS/ESH, 2014 WL 838080, at *8 (N.D.N.Y. Mar. 4, 2014) (citing *Fiorello v. Heckler,* 725

F.2d at 174, 175–76 (2d Cir. 1983)).  Mischaracterizing or ignoring evidence of Brown's alleged

disability also does not satisfy a substantial evidence standard.  *See Ericksson v. Comm'r of Soc.*

*Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008).

When an ALJ's reasons for discrediting a claimant's testimony does not constitute substantial

evidence, remand is warranted.  4 Soc. Sec. Law & Prac. § 55:76.

## IV.    CONCLUSION

For the reasons set forth above, the Court **GRANTS** Brown's motion for judgment on the

pleadings, **DENIES** the Commissioner's cross-motion, and **REMANDS** this case to the

Commissioner for reconsideration in accordance with this Order and Opinion. On remand, the

ALJ must develop the record of medical evidence related to Brown's IQ, apply proper weight to

treating physicians' medical opinions, and re-assess Brown's testimony.


**SO ORDERED this 27th day of September 2016**
**New York, New York**


**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

30